SUE S. COHEN et al., Doing Business as 868 UNION AVE. REALTY Co., Appellants-Respondents, v NEW YORK PROPERTY INSURANCE UNDERWRITING ASSOCIATION, Respondent-Appellant.

First Department, November 28, 1978

## APPEARANCES OF COUNSEL

*Ralph J. Palmer* of counsel *(Battle, Fowler, Jaffin, Pierce & Kheel,* attorneys), for appellants-respondents.

*Alan Jay Martin* of counsel *(Karen L. Bennett* with him on the brief; *Abrams & Martin, P. C.,* attorneys), for respondent-appellant.

## OPINION OF THE COURT

SULLIVAN, J.

At issue are the merits of a complaint seeking punitive damages from an insurer based on its conduct in the handling of a claim under the New York standard fire insurance policy. Plaintiffs insureds contend that the insurer's unreasonable delay in the processing of their claim constituted a willful, wanton and malicious breach of its contractual obligations, causing them great mental anguish and distress. In addition to punitive damages, plaintiffs seek to recover compensatory damages under the policy for their actual loss. The matter is before us on an appeal from a grant of partial summary judgment striking the claim for punitive damages.

Defendant is an unincorporated underwriting association of insurers organized and existing under article 17-B of the Insurance Law. Subject to certain specified exceptions, membership consists of all insurers who on a direct basis write fire and extended coverage insurance in New York State. (Insurance Law, § 652.) Such an insurer must be a member of the association as a condition of transacting this type of insurance business in the State. The association was created by the Legislature to provide fire and extended coverage insurance to persons having an insurable interest in property for which they have been unable to obtain such insurance after diligent efforts in the normal insurance market. (Insurance Law, § 653, subd 1, par [a]; *Brueckner v Superintendent of Ins.,* 39 AD2d 383, affd 33 NY2d 663.)

Plaintiffs owned an apartment house in The Bronx containing 25 occupied apartment units and 6 rented stores. It is

alleged that the building is located in a depressed area. On October 15, 1973, defendant agreed to insure the premises against fire loss to a limit of $190,000 for a term of one year. The policy was in full force and effect on July 26, 1974, when a fire in the premises caused severe damage to the roof and certain apartments. The apartments underneath the damaged portions of the roof were left exposed to the elements. Before the fire there were no fire, housing or building department violations against the premises.

Thereafter, on or about July 27, 1974, plaintiffs retained a firm of public adjusters to act on their behalf with respect to the loss. These adjusters advised defendant's representative about the condition of the roof and the necessity for immediate action to prevent further loss from rain entering through the open roof. It is alleged that defendant delayed its examination of the premises until on or about August 15, 1974, when its contractor met with the contractor retained by plaintiffs and agreed upon the figure of $14,938.25 as the cost of roof repair. It is clear, however, that defendant never agreed to this repair. Plaintiffs further allege that defendant refused to pay this amount, without prejudice, thus preventing them from making the necessary repairs to the roof, pending ultimate disposition of the claim.

On August 21, 1974, defendant was notified in writing by the public adjusters that, due to its delay in disposing of plaintiffs' claim, substantial additional water damage was being sustained. On that same date the public adjusters submitted an estimate, prepared by plaintiffs' contractor, of $165,-922 as the reasonable cost of repairing the premises.

Soon after the fire the Department of Rent and Housing Maintenance of the City of New York began serving notice of violations on the premises because of the damage caused by the fire. Defendant was advised of the existence of these violations.

On August 29, 1974, in an effort to expedite a settlement, especially in view of the continuing rain damage and the accrual of violations against the premises, Mrs. Cohen, the manager of the premises and one of the plaintiffs, met with Alexander Pirnie, Secretary of the Committee on Losses and Adjustments of the New York Board of Fire Underwriters, which was processing this claim for defendant. Among the various documents submitted to Pirnie at this meeting was a statement of income prepared by plaintiffs' accountants show-

ing a profit in excess of $12,000 from the operation of the premises for the year ending December 31, 1973. Plaintiffs contend that both Pirnie and John Prout, defendant's claims manager, ignored this undisputed statement of income, and relied instead upon an income estimate made by an appraiser appointed by defendant, showing a profit of only $5,000.

On or about September 18, 1974, after further water damage from heavy rains, a supplemental estimate was submitted, showing the cost of repair for this additional damage to be $17,424.

Plaintiffs claim that Pirnie delayed his recommendation of settlement to defendant until September 11, 1974, when he reported, in part:

"Frankly we must admit that the physical repair costs have only increased since the recent heavy rains. There was a substantial portion of the roof opened through this casualty and to the writers [sic] knowledge it was a sufficiently large opening to prevent temporary closure.

"Our recommendation is that we be granted authority up to $65,000 to dispose of this casualty."

Plaintiffs complain that, in making this recommendation, Pirnie relied solely on the estimate prepared by defendant's appraiser as to income.

The next day, September 12, 1974, defendant gave written notice that it was canceling plaintiffs' fire insurance policy effective October 16, 1974, because of "[p]hysical changes in the property * * * which result in the property becoming uninsurable". It is alleged that at the time this notice was sent, 17 of the apartments and all the stores were occupied.

Plaintiffs filed an appeal from this notice of cancellation with defendant's appeals committee on September 20, 1974. They contend that although defendant held several meetings to consider appeals between September 20, 1974 and November 6, 1974, it delayed its review of their appeal until November 6, 1974.

Plaintiffs further aver that it was not until October 4, 1974, more than three weeks after defendant's receipt of Pirnie's report, that Prout authorized the New York Board of Fire Underwriters to make an offer of settlement in behalf of defendant. Plaintiffs argue that neither Pirnie nor Prout can offer any explanation for this three-week delay, although Prout admitted that on receipt of the September 11, 1974

report he had all the information necessary to determine the amount to be offered in settlement.

Plaintiffs also complain that on October 28, 1974, when Mrs. Cohen and a representative of the public adjusters met with Pirnie and Prout in an effort to obtain a better offer, Pirnie advised Mrs. Cohen to accept the $65,000 that had been offered and to abandon the building.

Finally, on November 6, 1974, at the meeting to consider plaintiffs' appeal from the notice of cancellation, the appeals committee recommended that the loss department make an advance payment to plaintiffs against the outstanding loss "so as to enable the assured to properly secure the premises." Plaintiffs claim that although this recommendation was communicated to the loss department, defendant refused to offer an advance to plaintiffs for such purpose.

It is conceded, however, that defendant paid plaintiffs $60,000, without prejudice, on December 16, 1974, towards a settlement of their claim.

On the basis of these allegations, plaintiffs contend that defendants engaged in a course of conduct which was part of a scheme to exert unfair economic pressure on them to settle their claim for less than a fair amount; that this conduct constituted a willful, wanton and malicious breach of defendant's obligations under the policy and the statutes and regulations pertaining to the settlement of insurance claims and defining unfair settlement practices; and that by virtue of such conduct plaintiffs are entitled to punitive and exemplary damages in the sum of $500,000.

There is nothing novel about a dispute between an insurer and its insured over the dollar amount of compensable loss under a fire policy. It should be noted that defendant has never taken the position that plaintiffs are not entitled to a recovery under the policy. What defendant challenges, as it has throughout the pendency of this claim, is the quantum of loss, and consistent with that position it has paid $60,000, fully cognizant that plaintiffs would institute this action for the full amount of what they claim is due them.

Although plaintiffs rely heavily on defendant's delay in making a settlement offer, it is obvious that from the outset the parties could not agree on a settlement figure, and that, measured by the standard set by case law, defendant's conduct here fell palpably short of the mark in making out a claim for punitive damages. The standard for the allowance of punitive

damages against an insurer was set by the Court of Appeals in *Gordon v Nationwide Mutual Ins. Co.* (30 NY2d 427, 436-437):

"For breach of contract based only on a failure to make reasonable settlement of a claim within the policy limits, damages are measured by the policy limits. For a breach of implied conditions of the contract to act in its performance in good faith in refusing to settle within the policy limits, the damages may exceed the policy limits.

"The punitive nature of damage for the bad faith breach of contract is a characteristic of the law of contracts generally, and is not a peculiarity alone of the contract of liability insurance. In every contract 'there exists an implied covenant of good faith and fair dealing' [citation omitted]. * * *

"But a punitive measure of damages is not applied routinely for breach of contract; and bad faith requires an extraordinary showing of a disingenuous or dishonest failure to carry out a contract."

■ Our courts have repeatedly held that absent a showing of bad faith no recovery for punitive damages may be obtained. Bad faith exists "where the wrong complained of is morally culpable, or is actuated by evil and reprehensible motives, not only to punish the defendant but to deter him, as well as others who might otherwise be so prompted, from indulging in similar conduct in the future. *(Walker v Sheldon,* 10 NY2d 401, 404; citing *Toomey v Farley,* 2 NY2d 71, 83; *Krug v Pitass,* 162 NY 154, 161; *Hamilton v Third Ave. R. R. Co.,* 53 NY 25, 28; *Oehlohf v Solomon,* 73 App Div 329, 333-334; see, also, e.g., *Buttignol Constr. Co. v Allstate Ins. Co.,* 22 AD2d 689; *Sukup v State of New York,* 19 NY2d 519.)

■ Defendant's independent appraiser found that the annual net rental income from the building was $5,000, while plaintiffs claimed a net income of over $12,000 a year. By August 21, 1974, less than one month after the fire, plaintiffs were claiming damage to the property in the sum of $165,922. Thus, the parties were in dispute from the beginning as to the extent of the loss. When such significant differences exist as to the actual cash value of the property at the time of loss and the income derived from it, a hiatus of two months between loss and the first settlement offer can hardly be considered inordinate. Nor do we consider extraordinary the slightly more than three-week lapse between Pirnie's letter recommending that defendant pay $65,000, and defendant's first offer. It is indicative of defendant's belief that the damage was

not as costly as plaintiff claimed, that it offered $65,000, aware of Pirnie's statement in the same September 11th letter that $75,000 was the lowest figure plaintiffs' adjuster would consider. This statement is not contradicted in the record. In the commercial world, and particularly in the insurance industry, nominal delays where delicate negotiations are transpiring must be expected.

■ Furthermore, defendant was under no obligation to offer or make partial payment to plaintiffs pending settlement discussions. Although section 40-d of the Insurance Law prohibits insurers from engaging in unfair claims settlement practices, and enumerates specific proscribed acts, it does not impose on an insurer an affirmative duty to make a partial payment, simply because an insured claims that further damage will occur. Even if the insurer concedes, after a review of the claim and an investigation of the damaged premises, that additional casualty loss has been incurred, it is still not bound to make immediate payment, particularly when an honest dispute exists as to the amount of the loss.

Contractually, an insurer's obligation to pay under the standard fire policy does not arise until "sixty days after proof of loss * * * is received by [the] Company and ascertainment of the loss is made * * * by agreement between the insured and [the] Company expressed in writing" (Insurance Law, § 168).

■■ Defendant's answer denies plaintiffs' allegations of due performance of all conditions precedent. There is no allegation by plaintiff, let alone documentation, that a proof of loss was ever submitted. Nor is there any allegation of a waiver of this policy requirement. Obviously, under a pleading of performance, plaintiffs are barred from proving a waiver (*Allen v Dutchess County Mut. Ins. Co.,* 95 App Div 86). To allow a recovery for willful misconduct on an insurer's part when an insured itself has not shown compliance with all its obligations under the policy would work an unconscionable result. Moreover, the policy provides that in the event of disagreement either party may demand the appointment of appraisers to determine the extent of the loss. Plaintiffs never availed themselves of this right.

■ Plaintiff further claims statutory violations by defendant. Section 40-d of the Insurance Law, although setting a standard by which insurers are to process claims, does not create a private right of action but rather affords a public

right of redress by the Insurance Department for violations (Insurance Law, §§ 5, 280) after a hearing and determination. (Insurance Law, § 40-d, subd 3; § 278.) As was noted in *Labrina Corp. v New York Prop. Ins. Underwriting Assn.,* NYLJ, April 18, 1974, p 2, col 1: "The Legislature has enacted legislation, section 40-d of the Insurance Law, which applies to unfair claims practices by insurers. The statute performs the very same disciplinary function, which the plaintiff would have us apply here, and obviates the necessity for the maintenance of causes of action for punitive damages in insurance cases."

■ ■ Similarly, in *Frizzy Hairstylists v Eagle Star Ins. Co.* (93 Misc 2d 59) the court held: "punishment is more properly within the province and jurisdiction of the State Superintendent of Insurance [citations omitted]."

Defendant's cancellation of the policy was an exercise of a contractual right also held by the plaintiff. Defendant's only obligation before canceling was to give five days' written notice to the insured. (Insurance Law, § 278.) Moreover, defendant provided an appellate process by which an insured could challenge its actions. In fact, plaintiffs did avail themselves of the right to appeal from the cancellation notice, and their appeal was denied on November 6, 1974, for the reason that "[r]einspection indicates that conditions as stated in cancellation notice have not been corrected." While the appeals committee did recommend that the loss department consider an advance payment to enable the insured to secure the premises it did not do so out of any contractual duty, but because it recognized that the insured might be in a "catch-22" situation. As evidence of their good faith, the appeals committee also stated that "reinspection will be made upon notification that the building has been made secure." Under the law, defendant was required to provide coverage only on insurable property. (Insurance Law, § 653, subd 1, par [b].) Indeed, defendant's policy provides that it is the insured's obligation to "protect the property from further damage".

In summarily rejecting plaintiff's damage claim for $500,000 in punitive damages we do not urge the proposition that an insurance company may not be found liable in a civil suit for such damages. Rather, we stress the fact that the test for awarding such damages is a strict one, and is not found in the Insurance Law but rather, as already noted, in case law. Our courts should be loathe to countenance such an action when, as is the case here, it is woefully deficient in showing the

requisite facts to support the claim. There is no extraordinary showing here, based on the allegations in the complaint and supporting documents, that defendant exhibited "a disingenuous or dishonest failure" to carry out its contract. *(Gordon v Nationwide Mut. Ins. Co.,* 30 NY2d 427, 437, *supra.)* When asked in her examination before trial for the factual support for her pleading allegations, Mrs. Cohen's response was that "the facts speak for themselves." In truth, they simply do not.

Those cases in which punitive damages have been allowed involved liability policies where an insured had become liable to a third party for damages in excess of policy limits, as a result of an insurer's failure to settle for an amount within the policy limits when it had the opportunity. (See, e.g., *Brassil v Maryland Cas. Co.,* 210 NY 235; *Knobloch v Royal Globe Ins. Co.,* 38 NY2d 471; *Brunswick Realty Co. v Frankfort Ins. Co.,* 99 Misc 639.) We are unaware of any case involving first-party coverage where an assured has been allowed recovery for injuries to his feelings, as these plaintiffs seek. If defendant's actions in the handling of the claim are outside the scope of accepted settlement practice, be it statutory or otherwise, the Insurance Department is the public's surrogate for appropriate sanction.

It should be noted that plaintiffs' claim of actual damage to the property, after the additional expenses were incurred, amounts to $190,507.46, only $507.46 more than the policy limits. Thus, there is no danger that plaintiffs will suffer an out-of-pocket loss, since the policy will cover all damages unless they are awarded 100% of what they claim in their *ad damnum* clause, a prospect which hardly seems likely in the fact of the controversy.

Although plaintiffs argue that defendant's actions were part of a calculated scheme to force the abandonment of their building, with a view toward decreasing its risks, we see no evidence of that in this particular case. Nor is there any showing that defendant engaged in such a practice as a regular course of conduct. Defendant was acting within its statutory and contractual rights at all times during the negotiations but particularly when it canceled the policy. Under the provisions of the FAIR PLAN, the name of the program under which this insurance was written, defendant was obliged to cancel once the building became uninsurable. At the same time, by dropping one damaged building from its

rolls, it could not escape its duty to underwrite fire insurance on all other insurable structures in the area.

Finally, aside from the obvious advantages to the public when an insurer settles fairly and promptly, there are other considerations of public policy involved here. Defendant, as a condition for doing business in New York, is required by the State Insurance Department to join in a pool with other insurance companies to offer casualty insurance in depressed urban areas. Building owners in those areas are already faced with high operating costs for such items as insurance and repairs, without the imposition of additional expenses. The end result of a windfall award, such as is sought here, would be the charging of still higher premiums by insurance companies, causing greater expenditures for owners, and, more than likely, further abandonment of buildings by owners unable to realize a fair return. It would, in effect, foster the very ills that article 17-B of the Insurance Law was intended to cure. Courts should not be privy to a giveaway of policyholders' premiums, simply because an insured seeks more money than an insurer offers.

Accordingly, the order, Supreme Court, New York County (M. Evans, J.), entered March 14, 1978, granting defendant's motion to strike the claim for punitive damages in the amended complaint, should be affirmed, without costs or disbursements. The cross appeal from the order, entered November 30, 1977, should be dismissed as academic, without costs or disbursements.

Lupiano, J. (dissenting). Plaintiffs' original complaint set forth three causes of action—the first, to recover under an insurance policy issued by defendant as insurer to plaintiffs insuring the latter against all risk of loss to certain premises owned by plaintiffs caused by fire, which premises were damaged by fire; the second cause, to recover punitive damages in addition to the actual damages sustained as a result of the fire loss because of defendant's bad faith in refusing to settle plaintiffs' claim as a part of a plan to exert unfair economic advantage upon plaintiffs to settle for less than a fair amount, which plan was calculated to compel plaintiffs and other owners of buildings in distressed areas to abandon same, thereby reducing defendant's exposure to risk in the fire insurance pool; the third cause of action, to recover punitive damages in that defendant's act constitutes a violation of section 40-d of the Insurance Law. The Supreme Court

granted defendant's motion for summary judgment dismissing the complaint solely to the extent of dismissing the second and third causes of action holding that as a matter of law violation of section 40-d of the Insurance Law is limited in enforcement to the State Insurance Department and does not imply a private right of action for punitive damages and that plaintiffs' complaint does not suggest a fraudulent scheme by defendant in its dealings with the public evincing a high degree of moral turpitude and wanton dishonesty as to imply criminal indifference to civil obligations. However, the court permitted plaintiffs to amend their first cause of action to set forth a claim for punitive damages in compliance with the court's observations. Defendant appealed from this order of the Supreme Court, entered November 30, 1977, insofar as it granted plaintiffs permission to serve an amended complaint and plaintiffs cross-appealed from that part of such order which granted defendant summary judgment dismissing the second and third causes of action. Subsequently, plaintiffs served an amended complaint which incorporated all of the three causes of action in the original complaint into one cause of action. Defendant moved for leave to renew or reargue its prior motion for summary judgment, or, in the alternative, for an order dismissing the amended complaint pursuant to CPLR 3211 for failure to state a cause of action. The Supreme Court granted the motion with the pithy observation: "motion is granted to the extent of striking the claim for punitive damages from the amended complaint." In effect, the Supreme Court adhered to its prior view that no claim for punitive damages could be made by plaintiffs under section 40-d of the Insurance Law, i.e., such a claim would fail to state a cause of action because it could not be made and that no claim for punitive damages under the fraudulent scheme theory could be maintained by plaintiffs on the merits, that is, summary judgment had already been granted defendant due to plaintiffs' failure in pleading and proof by affidavits to demonstrate the existence of such scheme. Plaintiffs appealed from this latter order of the Supreme Court entered March 14, 1978.

The appeal by defendant from the order entered November 30, 1977 in effect was rendered academic by the subsequent order entered March 14, 1978 in defendant's favor striking plaintiffs' claims for punitive damages. There remains for consideration plaintiffs' appeal from the March 14, 1978 order and their cross appeal from the November 30, 1977 order. The

issue raised on this appeal may be phrased as follows: whether the factual allegations set forth in the amended complaint as supplemented by the affidavits submitted by plaintiffs in opposition to the defendant's motion for summary judgment and in opposition to the defendant's motion to dismiss are sufficient to sustain plaintiffs' right to a trial on the issue of punitive damages.

The factual averments by plaintiffs which may be gleaned from the record are as follows: Plaintiffs are the owners of premises 868 Union Avenue, Bronx, New York, a brick building containing 25 apartments and 6 stores. On October 15, 1973, defendant agreed to insure the premises against all risks of loss caused by fire, lightning and/or other perils to a limit of $190,000 for a term of one year. This insurance policy was in full force and effect on July 26, 1974, when a fire occurred in the premises causing severe damage to the roof and certain apartments. The apartments below the damaged portion of the roof were left exposed to the elements. Although the premises are located in a distressed (high insurance risk) area of The Bronx, the building had been maintained in immaculate condition until the fire, and there were no fire department, housing or building department violations pending against the premises on that date. There were no vacancies in the building on July 26, 1974, all six stores on the ground floor were occupied, and there was a waiting list of tenants. The rent roll exceeded $36,000 per annum on that date and the statement of income for the year 1973, prepared by plaintiffs' accountants, showed a net income in excess of $12,000.

On or about July 27, 1974, plaintiffs retained a public adjusters firm to adjust the fire loss on their behalf. Shortly thereafter, plaintiffs' adjusters advised the defendant's independent adjuster about the condition of the roof and the necessity for immediate action to prevent further loss due to possible water damage caused by rain entering through the open roof. Defendant's contractor did not examine the premises until August 15, 1974 (almost three weeks after the fire), at which time he agreed with plaintiffs' retained contractor that the cost of roof repairs would be $14,938.25. Defendant refused to pay such amount to plaintiffs, without prejudice, to enable plaintffs to make the necessary roof repairs. Plaintiffs' adjusters notified defendant on August 21, 1974 (over three weeks after the fire) that substantial additional water damage was being sustained as a consequence of the defendant's delay

in handling plaintiffs' claim. Also on that date, plaintiffs' adjusters submitted to defendant's adjuster an estimate of $165,922 (prepared by plaintiffs' contractor) as the reasonable cost of repairing the premises. Meanwhile, as a result of the fire damages sustained, plaintiffs began receiving notices of violations from the New York City Department of Rent and Housing Maintenance. These violations were in turn called to defendant's attention.

In an effort to expedite settlement of the claim in view of the escalating damage to the premises and the continuing imposition of violations thereon, plaintiff Sue Schiff Cohen, a manager of the premises, met on August 29, 1974 with Alexander Pirnie, secretary of the Board of Fire Underwriters, Committee on Losses and Adjustments, who was handling plaintiffs' claim for defendant. At this meeting, Ms. Cohen submitted to Mr. Pirnie a statement of income, prepared by plaintiffs' accountants showing a profit of over $12,000 from the premises for calendar year 1973. Pirnie and defendant's claims manager, John Prout, ignored this statement of income and adopted an estimate of income in the amount of $5,000 made by an appraiser appointed by defendant's adjuster. Meanwhile, heavy rains pouring through the unrepaired roof continued to cause additional water damage. On September 18, 1974 (almost two months after the fire) this additional damage was estimated at $17,424 by plaintiffs' contractor in a document submitted to defendant's adjuster.

Pirnie's report to defendant on September 11, 1974 (approximately a month and a half after the fire) recommended settlement in the amount of $65,000. This report relied solely on the appraisal made by the appraiser appointed by defendant's adjuster and *noted the increase in physical repair costs* due to the recent heavy rains. On the following day, September 12, defendant notified plaintiffs that physical changes in the property had resulted in its becoming uninsurable and the fire insurance policy was being canceled. At the time this notice was sent to plaintiffs, the premises were occupied by at least 17 families and all of the stores were occupied. Plaintiffs promptly notified defendant of these circumstances. Defendant failed and refused to give plaintiffs any further explanation of the basis for such cancellation despite plaintiffs' request for such explanation. Plaintiffs filed a notice of appeal from this notice of cancellation with defendant's appeals committee on September 20. Several meetings were held by defendant's

appeals committee to consider appeals between September 20, 1974 and November 6, 1974; defendant delayed its review of plaintiffs' appeal from the notice of cancellation dated September 12, 1974 until November 6, 1974. Meanwhile, defendant's claims manager did not authorize the New York Board of Fire Underwriters to make an offer of settlement to plaintiffs until October 4, 1974. Neither Pirnie nor Prout had any explanation for the more than three weeks' delay between the receipt of Pirnie's letter of September 11, 1974 by Prout wherein Pirnie recommended settlement in the sum of $65,000 and noted the continuing deterioration of the physical condition of the premises due to the elements, and Prout's authorization to Pirnie to make defendant's *first* offer of settlement to plaintiffs on October 4, 1974. Prout admitted that on September 11, 1974 he had all the information necessary to arrive at a determination as to the amount to be offered in full settlement of the claim.

On October 28, 1974, plaintiff Sue Schiff Cohen and her public adjuster met with Pirnie and Prout in an effort to obtain an increase in the settlement offer from the defendant. At that time Mr. Pirnie advised Ms. Cohen to accept the $65,000 offer and *to abandon the building.*

At the November 6, 1974 meeting of the defendant's underwriting committee, considering plaintiffs' appeal from the notice of cancellation of the policy, defendant's appeals committee recommended that the loss department advance a sum to plaintiffs sufficient to allow them properly to secure the premises. (This reasonable and pragmatic gesture was made over one quarter of a year after the fire.) This recommendation was shortly thereafter communicated to defendant's loss department. Nevertheless, defendant failed to offer an advance to the plaintiffs for such purpose.

Upon the basis of these factual averments contained in the amended complaint and the affidavits of plaintiffs alluded to above and supported by exhibits annexed thereto, plaintiffs contend that the defendant's conduct was part of a scheme to exert unfair economic pressure on plaintiffs to settle their claim for less than a fair amount and to abandon the premises, and that such conduct was adopted maliciously and willfully in utter disregard of defendant's civil obligations and the mandate of the statutes and regulations pertaining to the settlement of insurance claims. Accordingly, in addition to seeking compensatory damages of $121,846 (alleged damage in

excess of $65,000), plaintiffs seek punitive damages of $500,-000. Obviously, plaintiffs' factual averments are, in the main, disputed by defendant. This would entitle plaintiffs to a trial of these factual issues relating to punitive damages, assuming plaintiffs' claim for such damages is cognizable at law.

Initially, it is noted that an insurance company is not insulated by its nature from a claim for punitive damages for breach of good faith in the performance of its liability insurance contract, that is, a remarkable showing of bad faith by the company may well warrant submission of the case to a jury for imposition of liability beyond the policy limits whether the theory be breach of contract, negligence or fraud and deceit (see *Gordon v Nationwide Mut. Ins. Co.,* 30 NY2d 427; *Walker v Sheldon,* 10 NY2d 401). *Gordon v Nationwide Mut. Ins. Co. (supra)* involved an action on behalf of the insured against the insurer to recover damages which were essentially punitive for an alleged egregious breach of good faith on the insurer's part in refusing to settle negligence claims against the insured within the policy limits. The Court of Appeals did not dismiss the claim on the basis that it was not cognizable at law, but delved into the merits of the dispute. In pertinent language the court stated (pp 436-437):

"The rules governing the measure of damage chargeable to a liability insurer on failure, in violation of its contract * * * to settle a claim within policy limits, are rather well established and understood in the profession. There is essentially no difference of view within the court as to what the rules are. * * *

"For a breach of contract based only on a failure to make reasonable settlement of a claim within the policy limits, damages are measured by the policy limits. *For a breach of implied conditions of the contract to act in its performance in good faith in refusing to settle within the policy limits, the damages may exceed the policy limits.*

"The punitive nature of damage for the bad faith breach of contract is a characteristic of the law of contracts generally, and is not a peculiarity alone of the contract of liability insurance. In every contract 'there exists an implied covenant of good faith and fair dealing' *(Kirke La Shelle Co. v. Armstrong Co.,* 263 N.Y. 79, 87).

"The general application of the rule in New York is illustrated in *Van Valkenburgh, Nooger & Neville v. Hayden Pub.*

*Co.* (30 NY2d 34); *Underhill v. Schenck* (238 N.Y. 7), and *Wilson v. Mechanical Orguinette Co.* (170 N.Y. 542).

"But a punitive measure of damages is not applied routinely for breach of contract; and bad faith requires an extraordinary showing of a disingenuous or dishonest failure to carry out a contract" (emphasis supplied).

The insured failed to recover in *Gordon* not because he failed to state a cognizable claim for punitive damages, but because on the merits after trial the Court of Appeals perceived that the insured exhibited a "complete indifference to the obligations under his contract, or to the claims based on his negligence" which were sufficient to distinguish "the case sharply from those decisions in which policy limits have been exceeded because of the bad faith of an insurer" *(Gordon v Nationwide Mut. Ins. Co., supra,* pp 435-436). The court noted the incongruity of permitting a party (in that case, the insured), indifferent to his contractual obligations arising from a liability insurance policy, to succeed in imposing a heavy punitive judgment on the other party (the insurer) to the contract for not performing it in good faith.

As aptly noted by the Court of Appeals in *Walker v Sheldon (supra,* pp 404-405): "Punitive or exemplary damages have been allowed in cases where the wrong complained of *is morally culpable,* or is actuated by evil and reprehensible motives, not only to punish the defendant but to deter him, as well as others who might otherwise be so prompted, from indulging in similar conduct in the future * * * 'It is not the form of the action that gives the right to the jury to give punitory damages, but the *moral culpability* of the defendant.' Although they have been refused in the 'ordinary' fraud and deceit case [citation], we are persuaded that, on the basis of analogy, reason and principle, there may be a recovery of exemplary damages in fraud and deceit actions where the fraud, aimed at the public generally, is gross and involves high moral culpability. And this court has * * * sanctioned an award of such damages in a fraud and deceit case where the defendant's conduct evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as *to imply a criminal indifference to civil obligations"* (emphasis supplied).

It is the criminal indifference to civil obligations, the moral culpability, the bad faith, i.e., the extraordinary showing of a disingenuous or dishonest failure to carry out a contract, which renders a party susceptible to an award of punitive or

exemplary damages. Obviously, as a general proposition a fire insurance policy is a necessity for the property owner. Indeed, the tremendous need for insurance mandated either by statute, by practical necessity or by the citizen's desire to protect himself and his loved ones has resulted in the creation of a huge industry—the insurance industry, which wields, by virtue of its size and the realities enunciated above, enormous power. Recognition of this power has impelled the State to balance the scales, that is, to enact safeguards to protect the citizen (in the aggregate the public) from abuse. The State Legislature in 1970 enacted section 40-d of the Insurance Law which prohibits insurers doing business in this State from engaging in unfair claims settlement practices. An unfair claim settlement practice by the insurer as delineated in the statute consists, *inter alia,* of the following acts when such acts are committed with such frequency as to indicate a general business practice: failure to acknowledge with *reasonable promptness* relevant communications with respect to claims, failure to adopt and implement reasonable standards for the *prompt investigation* of claims and failure to attempt *in good faith* to effectuate *prompt,* fair and equitable settlement of claims.

Although section 40-d limits enforcement to the State Insurance Department to correct these unfair acts when they are performed with such frequency as to indicate a general business practice, the section is silent as to what protection or relief is afforded when an insurer engages in an outrageously unfair act, but such does not occur with the requisite frequency so as to incur the displeasure of the State Insurance Department. In this regard, section 273 of the Insurance Law provides: "The following are hereby defined as unfair methods of competition and *unfair and deceptive acts or practices* in the business of insurance viz: The commission of *any one* or more of the acts prohibited by sections * * * forty-d * * * of this chapter" (emphasis supplied). Section 272 of the Insurance Law prohibits any person from engaging in such act or practice in the business of insurance in this State.

Accordingly, it may not be concluded that an insurer in picking the instances when it chooses to engage in an unfair and deceptive act can thereby isolate itself from legal retribution by the expedient of simply declaring that such act does not constitute unfair claim settlement practices under section 40-d of the Insurance Law. While safeguarding itself from the

assertion that it has engaged in unfair claim settlement practices, the insurer does not have "carte blanche" to engage in an unfair claim settlement act or practice. Apropos of this self-evident corollary is the statement by the Fourth Department in *Cappano v Phoenix Assur. Co. of N. Y.* (28 AD2d 639-640): "As was stated in *Harris v. Standard Acc. & Ins. Co.* (191 F.Supp. 538, 540 [Kaufman, J.]), cited with approval in *Brown v. United States Fid. & Guar. Co.* (314 F.2d 675): 'Since the company, therefore, has power, through the control of settlement, to adversely affect the insured's interests, it must necessarily bear a legal responsibility for the proper exercise of that power. Thus, the law imposes upon the insurer the obligation of good faith—basically, the duty to consider, in good faith, the insured's interests as well as its own when making decisions as to settlement. Bad faith—the failure to comply with this obligation—is generally proven by evidence largely circumstantial in nature.' "

The relevance of the guidelines for proper conduct to be engaged in by an insurer in its settlement of claims enunciated in section 40-d of the Insurance Law to a suit by a private litigant seeking exemplary damage for the breach of such guidelines was aptly noted by Chief Judge BREITEL in his dissenting opinion in *Gordon v Nationwide Mut. Ins. Co.* (30 NY2d 427, 445, *supra):* "The doctrine that a liability insurer owes a duty of good faith to protect its insured, including the good faith consideration of opportunities to settle, because of its exclusive control in the management of claims has deep roots in New York [citations]. Indeed, a recent amendment of the Insurance Law imposes possible penalties upon insurers for 'not attempting in good faith to effectuate prompt, fair and equitable settlements of claims submitted in which liability has become reasonably clear' (§ 40-d, as added by L. 1970, ch. 296, § 1)".

Patently, the relationship of insured and insurer affects a huge segment of the general public and impinges upon an area of public policy which has become of increasing concern to the Legislature. Although section 40-d of the Insurance Law is enforceable only by the State Insurance Department, the standards for fair settlement practices delineated therein and promulgated by the Superintendent of Insurance in part 216 of title 11 of the regulations (11 NYCRR Part 216)[1] should not

---

1. This regulation is effective February 1, 1973. The preamble to this regulation (designated as section 216.0) states in subdivision (b): "This part is issued for the

be ignored by the courts in evaluating the course of conduct adopted by an insurance company in connection with its settlement of a claim and in determining the propriety of such conduct. In an ordinary and general sense no individual insured will be in a position to prove that its insurer has engaged in unfair settlement practices "with such frequency as to indicate a general business practice". This should not serve to shield the insurer against all accusations of a gross and maliciously unfair settlement practice in a private suit. An overly restrictive application of the sections of the Insurance Law set forth above and the regulations promulgated thereunder to the effect that the guidelines and standards of conduct delineated therein could be utilized only by the Superintendent of Insurance would serve to dilute the clear public policy enunciated by the Legislature in enacting such statutes. In effect, the court would give credence to the argument that an insurer might well indulge in a highly improper and dishonest settlement practiced in an individual case without fear of reprisal.

A further public policy consideration lurks in the pages of this record. The problem of urban decay and the abandonment by landlords of buildings in distressed areas of this metropolis have received widespread attention and media coverage. Response on the part of government at all levels, civic and church leaders and of the citizenry in general has given utterance to a clear public policy directed at the salvaging of buildings in distressed areas. As a concomitant, the insurance industry has experienced this public pressure in a renewed cry for the affording to landlords in distressed areas the requisite insurance protection under the purview of reasoned and prompt analysis and investigation.[2] The moral and ethical

---

purpose of defining certain minimum standards which, if violated without just cause * * * would constitute unfair claims settlement practices. This Part is not exclusive, and other acts, not herein specified, may also be found to constitute such practices." Relevant to the instant action is the following: Section 216.6 "(a) In any case where there is *no dispute as to coverage,* it shall be the duty of every insurer to offer claimants * * * amounts which are fair and reasonable as shown by its investigation of the claim, providing the amounts so offered are within policy limits and in accordance with the policy provisions * * * (d) In any case where there is no dispute as to one or more elements of a claim, payment for such element(s) shall be made notwithstanding the evidence of disputes as to other elements of the claim where such payment can be made *without prejudice* to either party" (emphasis supplied).

2. Defendant is an unincorporated underwriting association of insurers duly organized and existing under and by virtue of article 17-B (§§ 651-658) of the Insurance Law. As succinctly noted by Justice FEIN in *Berry v Stewart* (64 Misc 2d 590, 593):

imperative in stemming the tide of urban blight and in reclaiming these "lost" areas may not always coincide with business acumen and the profit motive. It may well be that the actions of the insurer herein can be viewed against the ambivalent and interlocking factors inherent in the war against urban decay. At the least, the policy factors inherent in the relationship of insured and insurer and in the case of distressed areas impel a liberal tendency by the court in its analysis of the legal issues presented by this appeal. What is most compelling is plaintiffs' strenuous urging first, that defendant's alleged deliberate delays before the loss committee made its first recommendation of settlement on September 11, 1974 must be evaluated against the background of defendant's knowledge of the damage being caused to the premises by heavy rains entering through the quite large opening in the roof and the stream of violations being thrust upon plaintiffs by the building department, second, the notice of cancellation sent by defendant immediately after receiving the September 11th letter from the loss committee recommending settlement and third, defendant's only offer of settlement at a very (unfair?) low figure with common sense knowledge that the premises would be left uninsured since plaintiffs would most likely be unable to obtain fire insurance coverage elsewhere.

It is well to reiterate at this point the purpose of punitive damages: "The object of exemplary or punitive damages is to punish the defendant and to restrain him and others from doing like acts in the future, and unless a wrongful motive exists, or there was wilful and intentional misdoing, or a reckless indifference equivalent thereto, there is no basis for an award of such damages. Exemplary damages may be recovered when, and only when, a wrongful act is done wilfully, wantonly, or maliciously, or is characterized by some

"The salutary purpose of the legislation is to 'promote orderly community development, especially in central city areas, by establishing a joint underwriting association to provide fire and extended coverage insurance for insurable properties * * * necessary to attract private capital to central city areas.' (Memorandum of Executive Department, Insurance-Joint Underwriting Association For Fire and Extended Coverage, 2 McKinney's Sess. Laws, 1968, p. 2255; see the Governor's Memorandum of Approval, 2 McKinney's Sess. Laws, 1968, p. 2363.) The interest of the people of the State in such legislation is manifest. It should be unnecessary to belabor the point with respect to this or any other plan to correct social and economic conditions in distressed areas. An adequate market for fire and extended coverage insurance—the two lines essential to mortgage and mercantile financing—is necessary to attract private capital to central city areas, and also to keep businesses in such areas, as noted in the legislative and executive memoranda."

other aggravating circumstance. In such cases *the law uses the suit of a private party as an instrument of public protection, not for the sake of the suitor but for that of the public.* It is not the form of the action that gives the right to the jury to give punitory damages, but the moral culpability of the defendant * * * The degree of misconduct necessary to warrant and uphold the allowance of punitive damages has been defined in varying language, but all definitions involve the idea of the intentional, wanton, wilful, or malicious commission of some illegal act, or of such a perverse and obstinate failure to discharge a duty as warrants and the presumption of a reckless indifference to the rights of others which is equivalent to intentional misconduct" (14 NY Jur, Damages, § 179; emphasis supplied).

Defendant, a creation of the Legislature, is for all practical purposes, the *only* insurer available to owners of "insurable" properties in distressed areas such as the plaintiffs. Therefore, if plaintiffs are able to prove their assertions as set forth in the amended complaint and the affidavits and attached exhibits that defendant has been guilty of extreme bad faith out of arrant and willful violations of the standards for fair settlements prescribed by the Legislature and the Superintendent of Insurance, then a stringent warning in the form of a grant of punitive damages that such conduct will not be tolerated may well serve as a deterrent to continued flaunting of the legislative intent manifested by the enactment of article 17-B and section 40-d of the Insurance Law. In this regard it is stated by plaintiffs that defendant was aware that the premises were not typical of other buildings in the distressed area of The Bronx where the premises are located, i.e., it had no violations, was not in a dilapidated condition, but was in "immaculate" condition. What is particularly irksome is the veiled suggestions that the insurer abused its power in its relationship with the insured after the fire in an attempt to secure nonrestoration of the premises, that is, abandonment by the insured.

Nothing of the foregoing analysis is to be construed as a finding that defendant has been guilty of the conduct attributed to it by plaintiffs. Such finding must await a trial on the merits where the parties will be put to their proofs before the finder of fact and of law. What must be concluded from the foregoing, however, is that plaintiffs are clearly entitled to

assert a claim for exemplary damages and to have their "day in court" on such claim.

A troublesome corollary of the majority's view that imposition of punitive damages on the insurer would result in the insurer's simply passing on the cost of such damages to the public in the form of higher premiums is the affording to an insurer a privileged status not enjoyed by other defendants faced with the prospect of paying punitive damages. Simply put, the majority would shield an insurer on a pragmatic basis from being charged with punitive damages on the theory that the public, for whose protection the law takes cognizance of the suit by a private party for punitive damages, would, in effect, be charged with the punitive damages in the form of higher premiums and thus the public policy underlying punitive damages would be frustrated. It follows, therefore, as a reasonable proposition that in no event should an insurer be faced with punitive damages. To accept this view is to give an insurer a degree of protection which cannot be justified on any moral or jurisprudential ground other than that of mere expediency and to subscribe to the view that the economic power of the insurer may obliterate an otherwise warranted application of the public policy considerations underlying the doctrine of punitive damages.

Insurers are not eleemosynary institutions and are governed by the same profit and loss and similar economic imperatives of the business community. The law does not dictate that as a matter of course an insurer must maintain a sacrosanct profit margin or that its cost of doing business is impervious to the imposition of punitive damages where properly warranted. Indeed, the cries as to why should stockholders be penalized by punitive damages awards imposed against the corporation in which they own stock may be simply answered: "Since stockholders enjoy the benefits of the corporation's profits and dividends, should they not take the setbacks with the gains in the corporate enterprise conducted for their profit?" (Trial Practice by Joseph Kelner, NYLJ, Oct. 12, 1978, p 3, col 3).

It also appears that the majority assumes that the end result of an award of punitive damages against an insurer such as defendant would be the *automatic* charging of still higher premiums. This view ignores the power of the Superintendent of Insurance and the controlling statutory mandates which govern the setting of rates for risks (see Insurance Law, §§ 181-183; 29 NY Jur, Insurance, §§ 261-263; 30 NY Jur,

Insurance, § 783). To suggest that an insurer, found to have engaged in conduct requiring the imposition of punitive damages, may escape the economic burden which such public policy imposes by obtaining *automatically* an increase in premiums to make "good" the loss, belittles the role of the Superintendent of Insurance and the applicable statutory criteria which govern the rate-making aspect of the insurance business. Common sense dictates that within the ordinary course of events an insurer made responsible for an award of punitive damages could not relieve itself of the economic sanction, i.e., a diminished profit return, by passing such loss onto the public in the form of an increase in its premium rate.

To hold that giving credence where warranted to the public policy upon which the doctrine of punitive damage and the enactment of article 17-B of the Insurance Law are founded, would result in the frustration of the goals which such policy is calculated to achieve simply because the culprit is an insurer, does not comport with an even-handed dispensation of justice and may well serve as a predicate for rewarding the wrongdoer. Insurance companies are patently not beyond the reach of justice embodied in the guise of an award of punitive damages (see 11 Appleman, Insurance Law and Practice, § 6361; 20 Appleman, Insurance Law and Practice, § 11255). Insofar as the majority view in this appeal may be construed as advocating the absolute protection of insurance companies from such an award, it is pernicious.

With respect to the summary judgment nature of the instant appeal, it is well to recall the oft-quoted statement that "[i]ssue-finding, rather that issue-determination, is the key to the procedure" *(Esteve v Abad,* 271 App Div 725, 727). The majority, with an acute regard for the prerogative of an insurer, have circumspectly pruned the record in an endeavor to justify an issue-determination analysis which would frustrate plaintiff's obtaining a trial with respect to their punitive damage claim. Thus, great reliance is placed on the contractual provision that "[t]he amount of loss for which this Company may be liable shall be payable sixty days after proof of loss, as herein provided, is received by this Company and ascertainment of the loss is made either by agreement between the insured and this Company expressed in writing or by the filing with this Company of an award as herein provided." This contractual provision does not proscribe a payment of loss *at any time* after such loss has been sustained,

but merely sets an outside limit on when such loss must be paid. The insurance contract must be viewed not in a vacuum, but against the relevant surrounding circumstances if the good faith of the parties to the agreement is to be properly judged. Indeed, assuming ambiguity is not deemed a legislative enactment after its acceptance by the parties but derives its efficacy from the consent of the parties, the rule of strict construction mandates that the provisions of the standard policy "be construed most strongly against the insurer, and liberally in favor of the insured" (29 NY Jur, Insurance, § 596). Further, "[t]he obligation to use good faith in carrying out what is written underlies all written agreements. Every contract implies good faith and fair dealing between the parties to it * * * It is implied that neither party will do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract * * * It is likewise implied in every contract that there is a duty of cooperation on the part of both parties" (10 NY Jur, Contracts, § 203).

The majority in their invocation of the technical requirements of the insurance contract regarding proof of loss and when payment by an insurer cannot be further delayed or avoided, fail to give significance to the admissions by the insurer that public adjusters representing the plaintiffs presented claim figures to the insurer's representatives that the insurer offered to advance $60,000 to plaintiffs and that the insurer was willing to settle the claim for $65,000. Obviously, surrounding circumstances regarding a loss may, where appropriate, dictate the observance of the implied covenant of good faith on the part of an insurer in the disbursement of funds *on account* to an insured. This is not only not prohibited by the standard policy of insurance, but may be warranted by the implied covenant of good faith and the exigency of the surrounding circumstances.

Perplexing is the majority's claimed reliance on the absence of proof of loss being submitted by plaintiffs as justification for foreclosing plaintiffs from an opportunity to have the defendant's handling of plaintiffs' claim fully exposed and explored at a plenary trial. If such were the case, then the admission by the insurer that it offered plaintiffs $65,000 in settlement of plaintiffs' claim might be viewed as a charitable act or one based on mere speculation. The truth is that the insured and the insurer were engaged in the process of exchanging infor-

mation and views toward the goal of resolving the plaintiffs' claim. Co-operation between the insured and the insurer was mandated by the insurance contract and the underlying policy considerations. It is the issue of the genuineness of the insurer's good faith, the degree of co-operation or lack thereof on the insurer's part, the motive and intent of the insurer in its processing of the plaintiffs' claim which is at the core of plaintiffs' essay to cast the insurer in punitive damages.

Although the majority fully concedes the critical fact that defendant *never* took the position that plaintiffs are not entitled to a recovery under the policy, there is a cavalier silence respecting the exigency of the deteriorating condition of the premises due to the roof which was damaged by fire and defendant's alleged knowledge of same. Defendant's recognition of its liability under the insurance contract and its alleged awareness of the deteriorating condition of the premises, coupled with its inaction in making any payment on account of this liability to impede or prevent such deterioration, which inaction eventuated in cancellation of fire insurance protection for the premises, raises an issue of more than arguable factual relevance as to the imposition of punitive damages. To state that "[t]here is nothing novel about a dispute between an insurer and its insured over the dollar amount of compensable loss under a fire policy" is to misdirect attention from the real focus of the dispute between the parties. Patently, it is not the usual or ordinary case of a suit by a private party which might warrant application of the public policy underlying imposition of punitive damages. No, it is the interrelation of concomitant and highly individual circumstances which serves as a predicate for demonstrating the unique or unusual situation calling for such imposition.

While a delay, however short or long might be ordinary in one situation, it may well be extraordinary in another. Events and acts must be considered and evaluated not simply in isolation, but as part of the mosaic of the whole. To paraphrase the majority, the facts here, both controverted and uncontroverted, speak for themselves most eloquently when viewed not in isolation but in context with all the surrounding circumstances. They dictate with simple but persistent persuasion that this case may be the rare example where punitive damages are warranted.

Serious questions relative to punitive damages are raised on this record involving the insurer's good faith in meeting its

contractual obligations to plaintiffs. The record does not admit of reasoned and fair disposition of same and speculation may not be substituted for unassailed fact. Good faith on the part of the defendant viewed in connection with the defendant's alleged knowledge or imputation of knowledge regarding the condition of the premises on a continuing dynamic, not static basis, bespeaks a concomitant responsibility. This responsibility, if found to exist, may not be avoided by the simple expedient of closing one's eyes, covering one's ears, and holding one's breath (see *Cohen v Hallmark Cards*, 45 NY2d 493).

Finally, the majority's observation that defendant's original answer denies plaintiffs' allegation of due performance of all conditions precedent is simplistic in light of the defendant's admissions and the fact that many of the denials are of knowledge or information sufficient to form a belief. The original pleadings are amplified by affidavits and certain other available proof as required by CPLR 3212. While the test for awarding punitive damages is a strict one, it is certainly not a nonexistent one, and while plaintiffs are not entitled to summary judgment on their punitive damage claim (which they did not seek), it is equally clear that defendant is not entitled to summary judgment dismissing that claim (which defendant did seek).

To reiterate, the foregoing observations are to be construed as impelling the conclusion that plaintiffs are entitled to a trial of their punitive damage claim, not that defendant has been guilty of the conduct and motives attributed to it by plaintiffs.

Accordingly, the order of the Supreme Court, New York County (M. EVANS, J.), entered March 14, 1978, to the extent appealed from, that is, insofar as it granted defendant's motion dismissing the amended complaint, should be reversed, on the law, with costs and disbursements, and the amended complaint reinstated; the order of said court entered November 30, 1977, should be modified, on the law, to the extent of reversing so much thereof as granted defendant summary judgment dismissing the second and third causes of action, and, as so modified, should be affirmed.[3] The appeal by defend-

---

3. Insofar as such order directed service of an amended complaint to cure the defect of the original complaint in setting forth claims for exemplary damages as separate causes, whereas such claims constitute an element of a single total claim for damages, the order is proper. A demand for punitive damages does not amount to a separate cause of action for pleading purposes *(Knibbs v Wagner*, 14 AD2d 987; *Dworski v Empire Discount Corp.*, 46 Misc 2d 844).

ant from the order entered November 30, 1977, should be dismissed as academic.

MURPHY, P. J., and YESAWICH, J., concur with SULLIVAN, J.; LUPIANO, J., dissents in an opinion.

Order, Supreme Court, New York County, entered on March 14, 1978, affirmed, without costs and without disbursements; cross appeal from order of said court entered on November 30, 1977, dismissed as academic without costs and without disbursements.