BELCO PETROLEUM CORPORATION et al., Appellants, v AIG OIL RIG, INC., et al., Respondents.

In the Matter of the Arbitration between AIG SPECIALTY AGENCIES, INC., Respondent, and BELCO PETROLEUM CORPORATION, a Wholly Owned Subsidiary of Enron Corporation, et al., Appellants.

First Department, January 17, 1991

584

## APPEARANCES OF COUNSEL

*David R. Hyde* of counsel *(George Wailand* and *David B. Shontz* with him on the brief; *Cahill Gordon & Reindel,* attorneys), for respondents.

*Jack G. Stern* of counsel *(John E. Hoffman, Jr., David J. Dykehouse, Henry Weisburg, Deborah R. Meshulam* and *Valorie K. Vojdik* with him on the brief; *Shearman & Sterling,* attorneys), for appellants.

## OPINION OF THE COURT

WALLACH, J.

The appeal raises several issues, the most important being whether punitive damages can be awarded against an insurance company for conduct amounting to an unfair claim settlement practice as defined by Insurance Law § 2601. That issue—whether the common-law right to punitive damages is "preempted" by Insurance Law § 2601—is a pure question of law, and we address it first.

### PREEMPTION

Insurance Law § 2601 prohibits an insurance company from engaging in "unfair claim settlement practices". The term is defined to include certain acts "committed without just cause and performed with such frequency as to indicate a general business practice" (§ 2601 [a]), the most embracive of which is "not attempting in good faith to effectuate prompt, fair and equitable settlements of claims submitted in which liability has become reasonably clear". (§ 2601 [a] [4].)[1] The Superintendent of Insurance is authorized to determine whether an insurer has engaged in an unfair claim settlement practice, and to punish those who do with a fine not exceeding $500 for

---

1. The other prohibited acts are knowingly misrepresenting to claimants pertinent facts or policy provisions relating to coverage, failing to acknowledge with reasonable promptness pertinent communications as to claims, failing to adopt and implement reasonable standards for the prompt investigation of claims, and compelling policyholders to institute suits to recover amounts due under policies by offering substantially less than the amounts ultimately recovered in such suits.

each instance of noncompliance (Insurance Law § 109 [c] [1]). Unlike violations of the Insurance Law generally *(see,* Insurance Law § 109 [a]), section 2601 provides that an unfair claim settlement practice "shall not be a misdemeanor" (§ 2601 [c]).

Insureds have frequently invoked section 2601 against insurers as the basis for a claim of punitive damages. On each occasion that such has been considered by the Court of Appeals, the court assumed, arguendo, that section 2601 could be invoked by private litigants for that purpose, but nevertheless rejected the claim for failure to plead or prove a "general business practice" *(Halpin v Prudential Ins. Co.,* 48 NY2d 906, 908 [claim for punitive damages under section 2601 dismissed because "the one instance of unfair settlement practice pleaded (does) not constitute a general business practice within the meaning of the statute"]; *Hubbell v Trans World Life Ins. Co.,* 50 NY2d 899, 901 ["nothing has been shown, either via records of the Insurance Department or records of other litigation involving the same carrier or by other means, to demonstrate that the conduct complained of by the plaintiff occurred in more than this isolated instance"]; *Dano v Royal Globe Ins. Co.,* 59 NY2d 827, 829 [plaintiff's papers bereft of evidentiary proof of a general business practice as required by the statute]). Turning as they do on the failure of the insured to plead or prove a general business practice, these cases do not serve to explain the meaning of "bad faith" as used in section 2601, or otherwise shed light on the nature and quality of the acts that constitute an unfair claim settlement practice, and, as such, would justify an award of punitive damages if committed with such frequency as to indicate a general business practice.

Despite the very limited extent of the monetary penalty authorized under section 2601, and notwithstanding that unfair claim settlement practices are expressly stated not to be crimes, we accept the premise of the defendant-insurers here, and indeed consider it to be virtually self-evident, that section 2601, with its references to "bad faith" and a "general business practice", was intended to prohibit the type of wrongdoing for which punitive damages have been traditionally awarded in a fraud case, as well as wrongdoing that is less egregious.[2] The leading case setting forth the standard for an

---

2. A cause of action for fraud, it should be noted, can be predicated on a promise made without an intention of performance *(Rudman v Cowles Communications,* 30 NY2d 1, 9). There is a tendency to use the term "bad

*(n. cont'd)*

award of punitive damages in a fraud case is, of course, *Walker v Sheldon* (10 NY2d 401): the wrongdoing must be so "gross", evince such a "high degree of moral turpitude", and demonstrate "such wanton dishonesty as to imply a criminal indifference to civil obligations"; in addition, the wrongdoing must be "aimed at the public generally" *(supra,* at 405; *but see, Borkowski v Borkowski,* 39 NY2d 982, 983 ["It is not essential, as the Appellate Division stated, that punitive damages be allowed in a fraud case only where the acts had been aimed at the public generally."]).[3]

Recently, the Second Department, in *Roldan v Allstate Ins. Co.* (149 AD2d 20), explaining and reaffirming several of that court's earlier precedents *(Kurrus v CNA Ins. Co.,* 115 AD2d 593; *Mavroudis v State Wide Ins. Co.,* 121 AD2d 433; *Kent Centre Assocs. v Greater N. Y. Mut. Ins. Co.,* 139 AD2d 630), citing authority from this court as well *(Cohen v New York Prop. Ins. Underwriting Assn.,* 65 AD2d 71), and proceeding on the manifestly correct premise that section 2601 serves the

---

faith" as a shorthand reference for the type of wrongdoing that manifests the type of intention that can transform a breach of contract into a fraud, and thus justifies a claim for punitive damages *(see, Cohen v New York Prop. Ins. Underwriting Assn.,* 65 AD2d 71, 77).

3. At least in actions seeking punitive damages against insurers, we have, notwithstanding *Borkowski,* "consistently adhered" to *Walker's* public wrong requirement *(Samovar of Russia Jewelry Antique Corp. v Generali, General Ins. Co.,* 102 AD2d 279, 282-283). We find some vindication for this position in *Giblin v Murphy* (73 NY2d 769), which, we think, suggests that the requirement of a public wrong may be dispensed with when the parties are in a fiduciary relationship, or something like it, such as the husband-wife relationship in *Borkowski,* but not otherwise.

Insureds seeking to recover punitive damages against insurers for unfair claim settlement practices have argued that they need not show a public wrong, likening their claims to the common-law cause of action an insured has against an insurer for refusing in "bad faith" to settle within the policy limits a liability claim made against the insured by a third party. Under such a cause of action, the argument goes, damages in excess of the policy limits, and thus punitive in nature, are recoverable, at least to the extent necessary to indemnify the insured against the third-party claim, upon a showing of bad faith only, there being no need to show in addition a public wrong. Whatever its merits, the argument has been rejected by both this court *(Royal Globe Ins. Co. v Chock Full O'Nuts Corp.,* 86 AD2d 315, 318-319), and, somewhat less emphatically, by the Court of Appeals *(Halpin v Prudential Ins. Co.,* 48 NY2d 906, 908; *compare, Dano v Royal Globe Ins. Co.,* 59 NY2d 827, 829-830). If the excess damages recoverable in a bad faith refusal-to-settle action are to be viewed as punitive in nature, we see no reason why a "second level of punitive damages" should not be recoverable upon a showing that the insurer has made it a general business practice to engage in this or other types of bad faith conduct *(but see, Roldan v Allstate Ins. Co.,* 149 AD2d 20, 43).

"very same purpose as that which justifies the imposition of punitive damages in private actions, namely, the purpose of deterring conduct which is harmful to the public-at-large" (149 AD2d, *supra,* at 41), has held that wrongdoing that might otherwise support a claim for punitive damages cannot avail as against an insurer, since the power to punish insurers for such wrongdoing is, by virtue of section 2601, exclusively with the Superintendent of Insurance—in other words, that section 2601 preempts the common-law right to punitive damages *(accord, Telemaque v New York Prop. Ins. Underwriting Assn.,* 162 AD2d 444; *Kapeleris v Colonial Penn Ins. Co.,* 163 AD2d 918 [deciding an appeal from Sup Ct, Kings County]). Thus, under *Roldan,* an insurer who, for example, regularly bribes witnesses or destroys evidence (or, more akin to the alleged wrongdoing in this case, schemes to defraud [Penal Law § 190.60]) in order to avoid payment of meritorious claims—conduct that surely would excite the interest of the District Attorney as well as the Superintendent of Insurance—would not be subject to a claim for punitive damages.

We respectfully disagree, and decline to follow *Roldan (supra),* for reasons that go quite beyond our own recent precedents, which, while invariably rejecting claims for punitive damages against insurers for failure to plead or prove a public wrong, or, as it were, a general business practice, have continued to recognize, at least implicitly, the availability of punitive damages upon an appropriate showing of morally reprehensible conduct aimed at the general public *(see, e.g., Samovar of Russia Jewelry Antique Corp. v Generali, General Ins. Co.,* 102 AD2d 279, 281 ["It is well established in this State that a claim for punitive damages against an insurance company requires a showing of morally reprehensible conduct directed at the general public, i.e., a public wrong as opposed to a mere private wrong. The operative standard originated in *Walker v Sheldon* (10 NY2d 401) a fraud action"]; *Supreme Automotive Mfg. Corp. v Continental Cas. Co.,* 126 AD2d 153, 156, and cases cited therein [the wrongdoing alleged, consisting of bribery and destruction of evidence, "although legally and morally reprehensible", does not support a claim for punitive damages absent proof that it was of a continuous and systematic nature and aimed at the public generally]; *see also, Riordan v Nationwide Mut. Fire Ins. Co.,* US Dist Ct, SD NY, Dec. 3, 1990, Kram, J., 90 Civ 0467, slip opn, at 19 *[Roldan* "does not now appear to reflect the prevailing New York

view" and "espous(es) a rule at variance with established precedent"]).

■ *Roldan's* rationale is that "public officers or institutions are better suited than private litigants for the redress of essentially public, rather than private, wrongs, and that the imposition of those administrative or penal sanctions which are available to the State or its public agencies should displace the awarding of punitive damages in private lawsuits as the chief, if not exclusive, method of punishing and deterring misconduct which is aimed at the public in general." (149 AD2d, *supra,* at 42.) But if this be true—if courts, acting in the context of private lawsuits, really are not adequate to the task of adjudicating an allegation of wrongdoing "aimed at the public in general", and of then rationally admeasuring, by way of a monetary award, the " 'redress demanded by the public interest' " *(see, Walker v Sheldon, supra,* at 407 [Van Voorhis, J. dissenting], quoting *Dain v Wycoff,* 7 NY 191, 194) —then it should be left to the Legislature, not the courts, or at least not an intermediate appellate court, to say so, this because of the rule of statutory construction, not mentioned in *Roldan,* that " 'when the common law gives a remedy, and another remedy is provided by statute, the latter is cumulative, unless made exclusive by the statute' ". *(Burns Jackson Miller Summit & Spitzer v Lindner,* 59 NY2d 314, 324, quoting *Candee v Hayward,* 37 NY 653, 656; *see also, Hechter v New York Life Ins. Co.,* 46 NY2d 34, 39 ["it is a general rule of statutory construction that a clear and specific legislative intent is required to override the common law"].) No such expression of exclusivity is found in section 2601.[4]

The insurance companies urging preemption here, recognizing that the text of section 2601 does not itself suggest a specific legislative intent to abolish punitive damages, rely heavily on the legislative history behind that provision, consisting of two memoranda issued by the Governor's office before and after its adoption in 1970. The first of these memoranda in pertinent part reads as follows:

"While the courts are an appropriate body to resolve individual disputes, the Insurance Department should be given

---

4. Although not the subject of argument, we take note of Insurance Law § 109 (b), which provides that "[e]very penalty imposed by this section [referring, we think, to every violation of any provision of the Insurance Law] shall be in addition to any penalty or forfeiture otherwise provided by law." We have to wonder whether in the face of this provision anything more need be said on the question of preemption.

power concerning claim settlement practices generally—not as they may reveal themselves in any particular case, but as they appear after an overall, statistical review. General courses of conduct or general business practices cannot be effectively dealt with by individual litigants and the courts. If general business practices are to be affected directly—rather than only indirectly through the discipline of individual cases —this can best and most properly be accomplished by an administrative agency which exercises a continuing surveillance over the licensees and the practices in question. * * *

"The proposed bill, without empowering the Department to resolve individual claims and without infringing upon the proper functions of the judiciary, would define unfair claims practices and give the Department a balanced range of sanctions—fines, injunctions and rehabilitation—for use in those cases where the unfair practices are systematically present * * *. The proposal would help to protect consumers by focusing regulatory attention on, and providing regulatory power to deal with practices harmful to the public." (Governor's mem, 1970 NY Legis Ann, at 306-307.)

The second of these memoranda in pertinent part reads as follows:

"Under present law, when an insurer fails to deal fairly with claimants and policyholders—or, indeed refuses to pay a claim at all—the company's legal obligations are enforceable only by an individual claimant.

"Case by case treatment of unfair practices will protect the claimant who has the money and patience to stick it out. Many people cannot afford the time and expense of a court case, however, and for those people the availability of judicial proceedings is scant protection against the unscrupulous insurance company. * * *

"While the bill would leave to the courts the settlement of individual disputes, it would give the Insurance Department a strong tool to prevent misuse of the legal process and to deal with claims practices that are harmful to the public." (Governor's approval mem, 1970 NY Legis Ann, at 489.)

This legislative history does not convince us that it was a specific legislative purpose in enacting section 2601 to abolish, as against insurers, the common-law right to punitive damages, which, we note, is not even mentioned in the memoranda. On the contrary, far from working at cross purposes with that right, section 2601 dovetails with it nicely, and

seems rather designed to complement and effectuate it. In the ordinary case of an insured suing an insurer on a policy, the insured has no incentive to add an allegation of bad faith to his cause of action for breach of contract other than the prospect of punitive damages. But a bad faith breach of the policy, the authorities say, is not enough to support a claim for punitive damages; in addition, the insured must show that the bad faith was aimed at the public generally. Almost invariably, claims for punitive damages are dismissed because of the inability of insureds to gather proof that the wrongdoing was continuous and systematic and partook of a public nature. Now, an insured aggrieved by an unfair claim settlement practice can take his grievance to the Superintendent of Insurance; if the grievance has merit, the Superintendent will presumably take it up and investigate; the insured, be he of modest means or substantial, should then be able to use the results of that investigation in pressing a claim for punitive damages (see, Hubbell v Trans World Life Ins. Co., 50 NY2d, supra, at 901).

In the end, however, we think little more need be said in justification of our refusal to follow Roldan other than the "general view" it purports to "reflect" (149 AD2d, supra, at 42) —that courts, acting through the instrument of a private lawsuit, are ill-suited to redress a public wrong—is actually the minority view in this State, a view that was given full articulation in the Walker dissent (supra). It was a theme of that dissent that if punitive damages are meant to redress dishonesty so wanton as to imply, as the majority put it, "a criminal indifference to civil obligations", then punishment should be left to the orderly processes of the criminal law and not to the passions of an unconstrained civil jury. The response of the majority was that the criminal law is not a particularly effective deterrent against fraudulent business practices (and that, for the professional schemer, compensatory damages are nothing but a business expense), reflecting the long-held general view that punitive damages are not to be denied merely because the wrongdoing upon which the action is based may be or has been prosecuted in a criminal proceeding (36 NY Jur 2d, Damages, § 178; Wittman v Gilson, 70 NY2d 970). There is no reason in principle why a different rule should apply merely because the wrongdoing may be or has been penalized in an administrative proceeding.

Again, numerous cases in this Department since the adoption of section 2601 in 1970 have continued to cite Walker

*(supra)* as authority controlling the availability of punitive damages against an insurer for a bad faith breach of a policy. We are bound by those precedents as a matter of stare decisis.[5]

## FACTS

The remaining issues require a review of the facts. Plaintiff Belco Petroleum Corp. (Belco), engaged in oil and gas operations in Peru since 1959, procured insurance protecting it against certain political risks effective April 4, 1983. The insurance consisted of three substantially identical policies aggregating $200 million of coverage with respect to the risks of confiscation, expropriation and nationalization (referred to individually as the "CEN policies" or collectively as the "CEN policy"), and two successive policies, each for $50 million of coverage, with respect to the risks of currency inconvertibility and contract repudiation (referred to collectively as the "CR/CI policy"). Eleven insurance companies (the Insurers) participated in underwriting the CEN policy as "quota share" insurers, nine of them, including National Union Fire Insurance Company of Pittsburgh, Pa. (National Union), subscribing to the particular CEN policy denominated as policy No. 83237. National Union, which assumed the largest share of the risk under the CEN policy, approximately 45%, and is therefore referred to as the "lead underwriter", is a subsidiary of American International Group, Inc. (AIG), as are two of the other Insurers that subscribed to policy No. 83237 for a total of approximately 6% of the risk. It was on a National Union

---

5. *Cohen v New York Prop. Ins. Underwritng Assn.* (65 AD2d 71 [1st Dept]) is not to the contrary. Cited in *Roldan* (149 AD2d 20, 41) for its statements that section 2601 "does not create a private right of action but rather affords a public right of redress by the Insurance Department", and " 'obviates the necessity for the maintenance of causes of action for punitive damages in insurance cases' " since it " 'performs the very same disciplinary function' " as punitive damages (65 AD2d, *supra,* at 78-79, quoting *Labrina Corp. v New York Prop. Ins. Underwriting Assn.,* NYLJ, Apr. 18, 1974, at 2, col 1), *Cohen* was plainly decided on the basis of a finding of fact that the insurer did not act in bad faith in denying the insured's claim. The statements in question are thus dicta; the same is true of similar statements in *Riffat v Continental Ins. Co.* (104 AD2d 301 [1st Dept]). We would also note that in denying the claim for punitive damages, *Cohen* was careful to say that it was "not urg[ing] the proposition that an insurance company may not be found liable in a civil suit for such damages", but was rather "stress[ing] the fact that the test for awarding such damages is a strict one, and is not found in the Insurance Law but rather * * * in case law" (65 AD2d, *supra,* at 79).

form that Belco had applied for CEN insurance. The currency inconvertibility policy was issued by National Union alone pursuant to a separate application for insurance, as was the later contract repudiation policy which replaced it. The CEN policy provided that any payments made to Belco by National Union under the CR/CI policy would automatically reduce, by a similar amount, the Insurers' limit of liability under the CEN policy; the CR/CI policy provided that any payments made to Belco by National Union as a participant on the CEN policy would automatically reduce, by a similar amount, National Union's limit of liability under the CR/CI policy. The CEN policy also provided that the Insurers were to be responsible for 90% of any loss. Each policy contained a broad arbitration clause.

On May 16, 1986, Belco presented identical "Sworn Proof of Loss and Claim" forms to the 11 Insurers on the CEN policy. Asserting that beginning in August and ending in December 1985, the "Government of Peru took expropriatory action which directly and effectively deprived the Insured of its insured investment", and that, as a result, it sustained a loss of $393,395,000, Belco claimed the full $200 million limit of the CEN policy in that 90% of the claimed $393,395,000 loss exceeded $200 million. AIG, acting through its management arm, AIG Specialty Agencies, Inc., on behalf of National Union and its two other insurance company subsidiaries on the CEN policy, responded on August 19, 1986 by rescinding not only the CEN policy under which Belco claimed, but also the CR/CI policy, asserting a right to do so because of certain "material misrepresentations and/or concealments by Belco in its Application for Expropriation [i.e., CEN] Insurance".[6] At the same time, AIG remitted to Belco two checks for $6,802,836.64 and $985,118.75, representing a refund of all of the premiums Belco had paid to AIG on the CEN and CR/CI policies, respectively, since their inceptions, with interest. Also at the same time, AIG served on Belco a demand for arbitration "seek[ing] a declaration by the arbitrators that the policy [defined elsewhere in the demand as policy No. 83237] is

---

**6.** The alleged misrepresentations concerned the $317,678,000 value that Belco placed on its equipment in Peru, the accounting basis used by Belco to determine the value of its assets in Peru, Belco's failure to disclose an outstanding tax controversy between it and the government of Peru which might have given rise to a claim under the policy, and whether there were any "special agreements" between Belco and the government of Peru or other "unique and unusual aspects" in their relationship.

rescinded and void *ab initio.*" In short order, the eight other Insurers on the CEN policy not represented by AIG rescinded their respective interests in that policy, refunded to Belco the premiums that Belco had paid to them, and demanded arbitration in forms identical to that served by AIG. The demands were consolidated and presented to a single panel of three arbitrators.

Before answering the arbitration, Belco advised the Insurers that it would be contesting their rescissions of the CEN policy as well as National Union's rescission of the CR/CI policy, and holding the refunded premiums in a "stakeholder" account to abide the dispute. On September 17, 1986, it answered the arbitration, asserting that the information it had provided in its application for expropriation insurance was "accurate and complete" and that the Insurers had "acted in bad faith and in breach of their convenant of fair dealing" in rescinding the CEN policy, and demanding, by way of a counterclaim, $200 million under the CEN policy, punitive damages in an unspecified amount, and legal expenses. Thereafter, in a prehearing memorandum, Belco asked the arbitrators for $100 million in punitive damages, or, in the alternative, "specific findings that will serve as a predicate for an action for such punitive damages in a court of competent jurisdiction."

In addition to joining issue in the arbitration, Belco simultaneously instituted this action against the Insurers subscribing to the CEN policy alleging, insofar as pertinent, that they acted in bad faith and in breach of their convenant of good faith and fair dealing in, among other things, rescinding their respective interests in the CEN policy and demanding arbitration, and that "the lead underwriter, defendant National Union, and its corporate parent, AIG, have over the last few years engaged in a pattern and practice of rescinding insurance policies, without regard to the merits of the grounds for rescission, whenever faced with the possibility of a significant claim on a policy."

Six months later, in April 1987, after some motion practice, the parties stipulated to stay the action pending the arbitration. In October 1987, the arbitrators began to hear the proofs, and, on December 15, 1988, after 70 days of hearings, they rendered their award. The award denied the claims of the Insurers for rescission; found Belco's loss to be $161,000,000; directed the Insurers to pay Belco $144,900,000 (representing 90% of $161,000,000) with interest of 6% from December 1986 in accordance with the one-year "waiting period" provision of

the policy (rejecting Belco's request for 9% interest from August 1985); directed Belco to return the premiums that the Insurers had refunded to it, together with the interest earned by those premiums in Belco's stakeholder account; denied Belco's claim for punitive damages; directed that each side bear its respective legal costs and expenses; directed that, in accordance with a stipulation executed by the parties, the compensation of the arbitrators (amounting to $471,712.50) be borne equally by the two sides; and directed that the administrative fees and expenses of the tribunal (amounting to $111,700), and the expenses of the arbitrators (amounting to $41,337.57), also be borne equally by the two sides.

The Insurers complied with the award, but a dispute arose between Belco and AIG as to whether, under the award, Belco was required to return to AIG not only the premiums that AIG had refunded to it on account of the CEN policy, but also those that AIG had refunded to it on account of the CR/CI policy. Twice the Insurers requested the arbitrators to clarify the award in this respect, and twice the arbitrators modified the award to make it clear as can be that Belco was required to return the refunded premiums attributable to both policies, with interest—in other words, all of the money in the stakeholder account.

AIG instituted a proceeding to confirm the award as modified, seeking therein a money judgment of $1.6 million representing the refunded premiums for the CR/CI policy, with interest, that Belco was refusing to return. Belco responded by serving a notice on the Insurers advising that it was recommencing the instant action now that the arbitration was over; by moving for leave to amend the complaint so as to reflect the award and facts it learned during the course of the arbitration supposedly showing that the Insurers' "decision to rescind the Policies was made with little or no investigation", facts thus believed to be corroborative of the allegation of bad faith and supportive of the claim for punitive damages;[7] and

---

7. Under the CEN policy, Belco was obligated to take all reasonable measures to prevent or minimize a loss and maximize recoveries of its investment, including pursuit of "any and all diplomatic, administrative or judicial remedies which may reasonably be available". It was the theory of Belco's original complaint that it had complied with this provision of the policy, and that the urgings of the Insurers that it pursue yet further direct negotiations with the government of Peru were, together with the Insurers' rescission of the CEN policy and demand for arbitration, all part of "a course of conduct designed solely to avoid the need to make payments under

*(n. cont'd)*

by moving for vacatur of so much of the award as directed it to return to AIG the premiums attributable to the CR/CI policy, arguing that it never challenged the rescission of that policy and that no dispute concerning it had been submitted to the arbitrators. The Insurers cross-moved to dismiss the action, arguing that the claim for punitive damages is barred by the doctrine of res judicata, the arbitrators having already decided that Belco is not entitled to punitive damages; that the complaint does not allege sufficient to sustain a claim for punitive damages; and that punitive damages may not be awarded for what amounts to an unfair claim settlement practice as defined by Insurance Law § 2601.

IAS, on constraint of *Roldan* (149 AD2d 20, *supra),* dismissed the action on the ground that the claim for punitive damages is preempted by section 2601. IAS also confirmed the award in its entirety and granted AIG a money judgment of $1.6 million, saying that AIG's demand for arbitration "clearly put Belco on notice that all the policies were to be subject to the arbitration."

### RES JUDICATA

The award, in terms, states only that "No punitive damages are awarded [Belco]." It being firmly established that res judicata is applicable to arbitration awards *(Matter of Ranni [Ross],* 58 NY2d 715, 717), preclusion of Belco's claim for

---

the [CEN policy]." The relief sought was a declaration that Belco was not obligated under the CEN policy to pursue further direct negotiations with the government of Peru; an injunction preventing the Insurers from "interfering with [Belco's] valuable contractual rights under the [CEN policy]"; a stay of the arbitration demanded by the Insurers, or, in the alternative, "a declaration that the arbitrators must adhere to the substantive, procedural and evidentiary law of New York in deciding the rescission issues"; a declaration that the Insurers "have acted in bad faith and in breach of their covenant of fair dealing"; and punitive damages of $193,395,000 (obviously representing the difference between Belco's claimed loss of $393,395,000 and the policy limit of $200 million). Inexplicably, the relief clause did not include a demand for a money judgment of $200 million, unless such was implicit in the request for "such other relief as this Court may deem just and proper". The only relief sought in the amended complaint Belco now proposes is punitive damages of $70 million (the reckoning of which is not self-evident), and vacatur of so much of the award as directed Belco to return to AIG the premiums attributable to the CR/CI policy (which, as a procedural matter, should have been left out of the complaint and sought instead as cross relief in the opposition to AIG's confirmation proceeding). In effect, the proposed amended complaint sets forth a single cause of action sounding in fraud and seeking only punitive damages.

punitive damages by the award would be a foregone conclusion were it not also firmly established in this State that arbitrators lack authority to award punitive damages notwithstanding that the parties to an arbitration might have privately agreed otherwise *(Garrity v Lyle Stuart, Inc.,* 40 NY2d 354). Belco argues that the award simply reflects the arbitrators' understanding of their lack of authority to award punitive damages; the Insurers counter that while the courts will not enforce an arbitrator's award of punitive damages on policy grounds, it has never been held or suggested that where a party requests an arbitrator to make an award of punitive damages, or a finding of bad faith such as would enable a court to make an award of punitive damages, and the request is rejected, such a ruling will be denied effect by a court as beyond the arbitrator's authority. The Insurers also argue that the arbitrators would not have expressed their lack of authority in such an "elliptical manner", and that their rejection of Belco's requests for attorneys' fees and interest of 9%, and directive that the costs of the arbitration be borne equally by each side, are yet further indications that the denial of punitive damages "was clearly predicated on a finding that the Insurers had not acted in bad faith" in rescinding the CEN policy.

█ It cannot be determined from the face of the award whether the arbitrators' denial of Belco's claim for punitive damages was predicated on a finding that the Insurers rescinded the CEN policy in good faith. But, even if such denial were so predicated, we would not hold Belco's claim for punitive damages precluded by the award. If Belco stands to be estopped by a finding of good faith, then it should be that the Insurers stood to be estopped by a finding of bad faith, or, as the Insurers purport to acknowledge, "[h]ad the arbitrators awarded Belco either punitive damages or a finding of bad faith, Belco would have been well-armed to prosecute its punitive damages action even in the face of *Garrity's* general prohibition against the award of punitive damages by an arbitrator." We disagree. As a practical matter, a finding of bad faith would have been useless to a court in deciding upon the amount of punitive damages to be awarded, and would not have advanced Belco's claim for punitive damages one whit. Punitive damages " 'take their shape from the subjective criteria involved in attitudes toward correction and reform' " *(Garrity v Lyle Stuart, Inc.,* 40 NY2d, *supra,* at 359, quoting *Matter of Publishers' Assn. [Newspaper Union],* 280 App Div

500, 503); their amount is necessarily a function of the moral culpability of the wrongdoer as perceived by the fact finder *(see,* 36 NY Jur 2d, Damages, § 183). This is to say that the process of meting out punishment for wrongdoing cannot be divorced from the process of deciding whether wrongdoing occurred, and that the division of labor suggested by the Insurers—leaving it to the arbitrators to decide whether any wrongdoing occurred and to the courts to decide on the appropriate measure of punishment—is unworkable. If practical considerations dictate that the Insurers could not have been estopped by a finding of bad faith, then fairness dictates that Belco should not be estopped by a finding of good faith. In short, the submission, insofar as it put before the arbitrators questions relating to Belco's right to punitive damages, was an exercise in futility so far as Belco was concerned, and should therefore be deemed void.[8]

### PLEADING SUFFICIENCY

■ As against the lead underwriter, National Union, and its corporate parent, AIG,[9] the operative allegation behind Belco's

---

8. The Insurers argue, in a footnote to their brief, that the arbitration was governed by the Federal Arbitration Act (9 USC § 1 *et seq.),* under which arbitrators do have the power to award punitive damages, *Garrity* notwithstanding (citing *Bonar v Dean Witter Reynolds,* 835 F2d 1378, 1387 [11th Cir], and *Willoughby Roofing & Supply Co. v Kajima Intl.,* 598 F Supp 353, 360 [ND Ala], *affd* 776 F2d 269 [11th Cir]). Aside from questions we have as to whether the FAA governed this arbitration, it is simply asking too much of an intermediate appellate court of this State to accept, upon the 11th Circuit authorities cited, that an arbitrator, sitting in New York and acting under a contract containing a choice-of-law clause providing that "the construction, validity and performance of this policy shall be governed by the law of the State of New York, U.S.A.", is authorized to award punitive damages *(cf., Matter of Cone Mills Corp. [Nielsen Co.],* 90 AD2d 31, 33-34; *Matter of Brady & Co. v Form-Eze Sys.,* 623 F2d 261, 263, *cert denied* 449 US 1062).

9. AIG is not a named party in either the action or the special proceeding, which appear to have been consolidated in IAS's judgment. The complaint does name AIG Oil Rig, Inc., which signed policy No. 83237 on behalf of National Union (but only with respect to its assumption of approximately 2% of the risk; National Union signed the policy itself with respect to its assumption of approximately 43% of the risk) and AIG's other two subsidiaries on that policy. AIG Oil Rig is described in the demand for arbitration as a division of AIG Specialty Agencies, Inc. AIG Specialty Agencies, Inc. served the demand for arbitration, instituted the special proceeding to confirm the award, and described itself in the petition to confirm as the "managing agent" for various insurance companies, including National Union, and, like National Union, a wholly owned subsidiary of AIG. For
*(n. cont'd)*

claim for punitive damages is made on information and belief and is that they "have engaged in a pattern and practice of rescinding insurance policies, without regard to the merits of the grounds for rescission, whenever faced with a possibility of a significant claim on a policy". National Union and AIG appear to accept this allegation as consistent with an award of punitive damages insofar as it asserts that the rescission of their interests in the CEN policy had no basis in fact, but challenge it as "wholly conclusory" insofar as it asserts a pattern and practice. We agree with this characterization, and therefore dismiss the complaint as against National Union and AIG for failure to state a cause of action, albeit without prejudice to Belco pleading again. We think it incumbent on Belco, at the pleading stage, to disclose the sources of its information and belief and otherwise come forward with whatever evidence it has of the alleged pattern and practice (CPLR 3016 [b]; *Halpin v Prudential Ins. Co.,* 48 NY2d 906, *supra; Holoness Realty Corp. v New York Prop. Ins. Underwriting Assn.,* 75 AD2d 569); we also think that it should be given another opportunity to do so *(Lanzi v Brooks,* 43 NY2d 778, *mot to amend remittitur granted* 43 NY2d 947; 3 Weinstein-Korn-Miller, NY Civ Prac ¶ 3016.07 ["When a court determines that there has been no compliance with CPLR 3016 (b), it will generally dismiss the complaint, but grant leave to serve an amended complaint"]).

As against the other Insurers, the operative allegation behind Belco's claim for punitive damages is that "[i]n at least this instance, [they] have supported and followed that practice" of National Union and AIG of rescinding policies without reason. This not only fails to support but affirmatively undermines a claim for punitive damages. While we take no position as to whether it is morally reprehensible for "quota share" insurer to blindly follow the lead of the lead underwriter in rejecting a claim, if it is, the one instance of bad faith alleged amounts to nothing more than a breach of contract, or, at worst, an "ordinary" fraud *(see, Walker v Sheldon,* 10 NY2d, *supra,* at 405). Therefore, as against these other Insurers, we dismiss the complaint with prejudice.[10]

present purposes, we deem AIG Specialty Agencies, Inc. and AIG Oil Rig, Inc. to be AIG's alter egos, without prejudice to contrary argument before IAS.

10. The Insurers also argue, in passing, that the action should be dismissed in view of the arbitrators' finding that Belco's loss was only $161

*(n. cont'd)*

CONFIRMATION PROCEEDING

Belco seeks to vacate so much of the award as directed it to return to AIG the premiums for the CR/CI policy, arguing that it did not challenge AIG's rescission of that policy, that no dispute concerning it was submitted to the arbitrators, and that the arbitrators therefore exceeded their powers in addressing themselves to it.

AIG's demand for arbitration stated that it was made pursuant to the arbitration agreement contained in policy No. 83237, the particular CEN policy subscribed to by National Union and the two other AIG subsidiaries participating in the CEN risk, and described the dispute as concerning certain misrepresentations made by Belco in its application for CEN insurance. The primary relief AIG sought was a declaration that policy No. 83237 "is rescinded and void *ab initio*"; in addition, AIG sought to hold Belco responsible for payment of "all premiums" (seemingly referring only to the CEN premiums) due throughout the three-year term of "the policy" (seemingly referring only to the CEN policy) "[i]n the event the misrepresentations and/or concealments in the application (clearly referring to the CEN policy) are found to have been intentional and, therefore, fraudulent". Belco's answer and counterclaim alleged that the information it provided in the application was "accurate and complete"; further alleged

---

million. This finding "that Belco grossly overstated its losses by a staggering $232 million", the Insurers say, "vindicates [their] refusal to accept Belco's claim of a $393 million loss", and shows that the "attempted rescission in no way harmed Belco [since] even had the Insurers not rescinded, the parties still would have had to engage in the investigation, arbitration and subsequent litigation involving the inflated claim." This *post hoc* rationalization for rejecting Belco's claim—exactly when the amount of the claimed loss was first disputed by the Insurers, and why, is not disclosed in the record— does not meet the issue raised by the claim for punitive damages, namely, whether AIG's rescission of the CEN policy was but one instance of a general business practice of repudiating policies without reason. Resolution of that issue will turn on whether, *inter alia*, AIG had, as it claimed in its notice of rescission, a good-faith reason to believe that there were material misrepresentations in Belco's application for CEN insurance. We think it is altogether irrelevant to that issue that facts may have later come to light in the arbitration that would have justified AIG's rejection of Belco's claim for different reasons. It may also be pertinent to note in this regard that punitive damages need bear no definite relationship to actual damages, and indeed might even be awarded where actual damages are only nominal *(see, Hartford Acc. & Indem. Co. v Village of Hempstead,* 48 NY2d 218, 227, n 15).

that the Insurers "have acted in bad faith and in breach of their covenant of fair dealing"; and sought damages of $200 million, punitive damages, and expenses.

Thus, the only factual disputes put in issue by AIG's demand for arbitration were whether certain statements made in Belco's application for CEN insurance were false, and whether Belco knew them to be false; the only legal disputes put in issue were whether AIG could rescind the CEN policy if the statements were false, and whether it was entitled to all of the premiums due under the CEN policy if the statements were deliberately false. Belco's answer and counterclaim to AIG's and the other Insurers' demands expanded the submission only to put in issue whether the Insurers' rescissions were done in bad faith, and, if so, whether it was entitled to punitive damages.[11]

In view of the foregoing, it cannot be said that AIG's demand gave fair notice that AIG would seek return of the CR/CI premiums it had refunded to Belco in the event rescission of the CEN policy were denied by the arbitrators. But, for that matter, neither was the demand exactly explicit as to what should be done with the CEN premiums. Only if the alleged misrepresentations in the CEN application were found to have been deliberately false did the demand seek return of the CEN premiums. This may have served as fair notice that if the alleged misrepresentations were found to have been false, but not deliberately so, then Belco was to keep the CEN premiums, but what was to become of these premiums if, as apparently happened, the alleged misrepresentations were found to have been true and the CEN policy enforced? Arguing that question to the arbitrators, Belco characterized its stakeholder account (by which, it now explains, it meant only

---

11. Belco's answer and counterclaim in the arbitration also asserted that the Insurers, by rescinding the CEN policy "instead of responding to the Sworn Proof of Loss and Claim", "have waived all defenses to the enforcement of the [CEN policy] other than those expressly set forth in the[ir] notices of rescission and the[ir] Demands". We think this was fair notice that Belco did not regard the amount of its loss as being in dispute; nevertheless, the arbitrators did pass upon the amount of the loss, finding it to be only $161 million, or some 60% less than the $393 million claimed. As this aspect of the award is not challenged by Belco, we can only assume that at some point during the course of the arbitration the arbitrators were asked to take up the amount of Belco's loss, and agreed to do so (see, United Buying Serv. Intl. Corp. v United Buying Serv., 38 AD2d 75, 79, affd 30 NY2d 822).

the CEN premiums)[12] as a "booby prize". Like the Insurers, Belco simply seemed to have taken it for granted that a natural incident of any relief enforcing the CEN policy would be its return of the CEN premiums to the Insurers.

■ Arbitrators are not bound by rules of law. They may do justice as they see it, and have broad powers to fashion remedies even beyond what the parties request *(Matter of Silverman [Benmor Coats],* 61 NY2d 299, 308; *Matter of SCM Corp. [Fisher Park Lane Co.],* 40 NY2d 788, 792-794). In deciding whether the arbitrators exceeded their power in directing Belco to return the CR/CI premiums, the question is not whether AIG's demand for arbitration gave fair notice that such would be sought in the event the dispute described in the demand were decided in Belco's favor, nor whether the CR/CI premiums constituted legal consideration for the CEN policy. The question, rather, is whether it was "totally irrational" of the arbitrators to direct return of the CR/CI premiums in fashioning relief meant to enforce the CEN policy *(see, Matter of Silverman [Benmor Coats],* 61 NY2d, *supra,* at 308; *Rochester City School Dist. v Rochester Teachers Assn.,* 41 NY2d 578, 582; *Lentine v Fundaro,* 29 NY2d 382, 386). We think not—the mirror image limitation of liability clauses in the two policies, under which the coverage provided in the one was to be automatically reduced by the amount of any payments made under the other, do provide a rationale. The arbitrators might have reasoned that had AIG honored Belco's claim under the CEN policy and paid National Union's share of the loss, coverage under the CR/CI policy would then have been reduced to the point of elimination, resulting in its effective cancellation. Belco would have been left without

---

12. The few parol references in the record to the arbitration hearing indicate that both sides were coy with the arbitrators concerning the CR/CI premiums. Belco, emphasizing now that its answer did not challenge the rescission of the CR/CI policy, professes surprise that the arbitrators presumed to treat with the CR/CI premiums. But if Belco believed that these premiums belonged to it outright, no matter what the outcome of the arbitration, then why did it commingle them with the CEN premiums in the stakeholder account it set up to abide the dispute? Belco says that it did so as an "administrative convenience", but the fact remains that it never did forthrightly advise the arbitrators that the two premiums were to be treated differently in the event it prevailed and the CEN policy were enforced. For its part, AIG, emphasizing now that the two policies were "inextricably connected" by their mirror image limitation of liability clauses, allows that it never did forthrightly urge this connection to the arbitrators. Explaining why not, AIG seems to say that argument on the subject was not necessary since "it is facially apparent that the policies are bound together".

coverage under the CR/CI policy although out-of-pocket and current on all the premium payments due thereunder—precisely the result reached by the arbitrators.

## DISPOSITION

Accordingly, the judgment of the Supreme Court, New York County (Walter M. Schackman, J.), entered February 9, 1990, which dismissed the action with prejudice against all of the named defendants, confirmed the arbitration award, and awarded a money judgment of $1,621,422.26 with interest from January 4, 1989 in favor of petitioner AIG Specialty Agencies, Inc., and against respondents Belco Petroleum Corporation and, its corporate parent, Enron Corporation, should be modified, on the law, to reinstate the action against defendants National Union Fire Insurance Company of Pittsburgh, Pa. and AIG Oil Rig, Inc. and petitioner AIG Specialty Agencies, Inc., and otherwise affirmed, without costs.

The order of the same court, entered January 29, 1990, which, *inter alia,* denied that branch of plaintiffs' motion for leave to serve an amended complaint and granted defendants' cross motion to dismiss the action, should be modified, on the law, the facts, and in the exercise of discretion, to grant plaintiffs leave to move before IAS for leave to serve an amended complaint naming National Union Fire Insurance Company of Pittsburgh, Pa., AIG Oil Rig, Inc. and AIG Specialty Agencies, Inc. as party-defendants, such motion to include a copy of the proposed amended complaint accompanied by disclosure of the evidentiary facts which would support the allegation that defendant National Union, and its corporate parent, American International Group, Inc., "have engaged in a pattern and practice of rescinding insurance policies, without regard to the merits of the grounds for rescission, whenever faced with the possibility of a significant claim on a policy", without prejudice to AIG Oil Rig, Inc. and AIG Specialty Agencies, Inc. arguing that they are separate from American International Group, Inc. and should not be held responsible for its liabilities, and otherwise affirmed, without costs.

KUPFERMAN, J. P., SMITH and RUBIN, JJ., concur.

Judgment, Supreme Court, New York County, entered on February 9, 1990, unanimously modified, on the law, to reinstate the action as against defendants National Union Fire Insurance Company of Pittsburgh, Pa., and AIG Oil Rig, Inc.,

and petitioner AIG Specialty Agencies, Inc., and otherwise affirmed, without costs. The order of said court entered on January 29, 1990, unanimously modified to grant plaintiffs leave to move before IAS court to serve an amended complaint, and for other relief as set forth in this court's opinion.