■ MARSEL MIRROR & GLASS PRODUCTS, INC., Respondent, v AMERICAN INTERNATIONAL UNDERWRITERS INSURANCE COMPANY, Also Known as AMERICAN INTERNATIONAL UNDERWRITERS CORPORATION, et al., Appellants. [599 NYS2d 248] —Order, Supreme Court, New York County (Diane A. Lebedeff, J.), entered December 11, 1992, which *inter alia* denied defendants' motion to dismiss the second and fifth through eighth causes of action in the complaint pursuant to CPLR 3211 (a) (1), (5) and (7) and 3016 (b), unanimously modified, on the law, without costs, to grant the motion to dismiss the second cause of action, and as so modified, affirmed.

Plaintiff, engaged in the business of manufacturing mirrors and glass products for sale to retailers, purchased insolvency risk insurance from defendants to cover plaintiff's accounts receivable if a customer covered by the policy defaulted in payment as a consequence of its bankruptcy or insolvency. Plaintiff claims that although it read the terms of the contract, it was "unknowledgeable in the technical insurance jargon of the contract" and so relied on defendants' written and oral representations that the policy would provide recovery of claims without a waiting period. The written representation upon which plaintiff relies, a one-page general description of insolvency risk insurance, contains the following disclaimer: "The description of coverage above is a summary only. The coverage is subject to terms and conditions outlined and certain restrictions, limitations, and exclusions contained in the policy of insurance. The above description is not a policy of insurance. In the event of any conflict between the above description of coverage and the policy of insurance, the provisions contained in the policy will govern. Coverage is underwritten by a member insurance company of American International Group, Inc."

In April 1990, during the policy period, a covered customer, Ames Department Stores, filed for reorganization under chapter 11 of the Bankruptcy Act (11 USC) due to Ames' insolvency. In May 1990 plaintiff submitted a proof of loss to its carrier, defendant National Union Fire Insurance Company of Pittsburgh, Pa., claiming a qualifying loss of $1,780,257. In June 1990 plaintiff filed a claim for $1,815,171 in the Bankruptcy Court. Ames did not recognize plaintiff's claim until September 1991. In this regard we note that "qualifying loss" was defined in the policy as here pertinent as "the amount of the Net Invoice Value unpaid by the Buyer directly due to its Insolvency and recognized by the receiver or its legal equivalent appointed to manage the insolvent Buyer's affairs as a valid debt of the Buyer to the Insured" (emphasis omitted). After negotiations, plaintiff and Ames agreed in a memorandum dated September 12, 1991 that Ames' pre-petition debt to plaintiff was $1,660,472.

Meanwhile, 14 months prior to its agreement with Ames, plaintiff resolved its insurance claim with National Union. Plaintiff had contended that it was entitled to its entire claim promptly after Ames' insolvency, while National Union had contended that the claim was not a qualifying loss under the policy until recognized by a receiver or its legal equivalent as provided in the policy. In July 1990, less than three months after plaintiff had submitted its insurance claim, plaintiff accepted $1,500,000 in full satisfaction of its insurance claim, assigned its claim against Ames to National Union up to the amount National Union was paying plaintiff, and agreed to cancellation of its policy before expiration of its term. In exchange, plaintiff acknowledged in its complaint that it released National Union "from all debts, claims, demands, damages, actions and causes of action of whatsoever character and consequence which in any way is related to the Policy, including, but not limited to plaintiff's claim against defendants resulting from the insolvency of Ames."

By its second cause of action plaintiff sought to invalidate the release on grounds of fraud and economic duress and to recover $304,000. A release has been described as "a jural act of high significance without which the settlement of disputes would be rendered all but impossible. It should never be converted into a starting point for renewed litigation except under circumstances and under rules which would render any other result a grave injustice. It is for this reason that the traditional bases for setting aside written agreements, namely, duress, illegality, fraud, or mutual mistake, must be estab-

lished or else the release stands." *(Mangini v McClurg,* 24 NY2d 556, 563; *Touloumis v Chalem,* 156 AD2d 230, 231-232.)

In our view neither fraud nor economic duress was sufficiently pleaded. The elements of a fraud claim require a material misrepresentation of an existing fact, made with knowledge of its falsity, with the intent to deceive, justifiable reliance and ensuing damages *(Lanzi v Brooks,* 54 AD2d 1057, 1058, *affd* 43 NY2d 778). The language defining qualifying loss and insolvency in the policy cannot be deemed fraudulent representations, since the policy not only covered chapter 11 petitions but all bankruptcies and other types of insolvencies which require some adjudication or acceptance by a court of the claim's validity. Here, National Union insisted that the debtor in possession, Ames, validate the claim before National Union paid it in full. This was not unreasonable since the actual claim recognized by Ames, and assigned to defendants under the release, totaled approximately $1.6 million instead of the $1.8 million proof of claim filed by plaintiff in the bankruptcy proceeding. We note that defendants recovered a small fraction of the proof of claim as assignee of plaintiff in the Ames bankruptcy proceeding.

Plaintiff's purported reliance on certain alleged statements by defendants that Ames might not recognize its indebtedness for some two years is an insufficient basis to support a fraud claim seeking to vitiate the release. The defendants' requirement that the debt be recognized by Ames was not unreasonable under the terms of the insurance contract defining qualifying loss and insolvency and, in fact, it took almost 14 months before Ames did validate the exact amount of the debt it would recognize in favor of plaintiff. In any event, defendants merely offered their opinion as to how long it would take, and as opinion, it was not a representation of a material existing fact upon which a fraud claim may be sustained *(see, Mergler v Crystal Props. Assocs.,* 179 AD2d 177, 181).

Finally, with respect to the second cause of action, the claim of economic duress is unsupported, and in any event, would not be sufficient to vitiate the release. There is no showing that defendants were aware or could be aware of plaintiff's cash flow situation and further, even if the defendants were aware of plaintiff's need for a cash infusion, their interpretation of the insurance contract was not unreasonable, and accordingly was not sufficient to vitiate the release.

As for the remaining causes of action in the complaint under consideration, causes five through eight, those causes are based on allegations that the defendants engaged in

improper and unfair settlement practices under Insurance Law § 2601 for which plaintiff seeks punitive damages. It is defendants' contention that Insurance Law § 2601 does not create a private cause of action for which punitive damages may be recovered. However, as Justice Lebedeff observed, this Court has adopted the view that a cause of action for punitive damages for violation of Insurance Law § 2601 may be maintained as a private cause of action *(Belco Petroleum Corp. v AIG Oil Rig,* 164 AD2d 583), and accordingly those causes of action may be sustained at the pleading stage. Concur—Carro, J. P., Milonas, Ellerin and Kassal, JJ.